UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA,**

vs.                                                                                              Case No.: 8:12-CR-55-T-23EAJ

**THOMAS LYNNE TREJO and
JOAQUIN RAMIREZ.**
_____/

## REPORT AND RECOMMENDATION

Before the Court are Defendants Thomas Lynne Trejo and Joaquin Ramirez's **Motion to Suppress** (Dkt. 28) and the Government's **Response** (Dkt. 35).[1] Following an evidentiary hearing and oral argument, it is recommend that the motion to suppress be denied.

## Background

On February 9, 2012, Defendants were indicted on two counts of possession with intent to distribute fifty grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 21 U.S.C. § 846. On January 6, 2012, Florida Highway Patrol Troopers found, among other things, three packages of methamphetamine in a vehicle Defendants were driving. The search of Defendants' vehicle occurred incident to a traffic stop for following another vehicle too closely and for having illegal window tint. Defendants seek to suppress all evidence obtained during the January 6, 2012 search.[2]

## Findings of Fact

---

[1] The motion was referred to the undersigned for a report and recommendation (Dkt. 29). See 28 U.S.C. § 636(b); M.D. Fla. R. 6.01(b)-(c). The motion was filed by Defendant Trejo and later joined by Defendant Ramirez (Dkt. 32-33).

[2] Defendants' motion also seeks to suppress any statements Defendants made on January 6, 2012 or any date thereafter while Defendants remained in custody. At the hearing, Defendants withdrew their Miranda objections except as to statements obtained incident to an unlawful search and seizure.

The following facts are established by a preponderance of credible evidence:

1. On January, 6, 2012 at about 9 a.m., Florida Highway Patrol Trooper Jason Lemery ("Lemery") was contacted by a detective from the Polk County Sheriff's Office and asked to be on the lookout ("BOLO") for a white Chevy Tahoe occupied by two males that was traveling south on Interstate 75 ("I-75"). Lemery was also told that the Chevy Tahoe had a Florida license plate with a tag number of ADCT27 and that the vehicle was suspected of transporting narcotics.

2. After receiving the BOLO, Lemery requested assistance from a canine unit, and he ceased his normal patrol activities to look for the Chevy Tahoe. Lemery parked his patrol car on the median of I-75 near the county line for Sumter and Marion counties. Lemery parked his car so that it was facing perpendicular to southbound traffic. Lemery typically parks his patrol car in this fashion when monitoring traffic.

3. As the Chevy Tahoe approached Lemery's position, he received updates from law enforcement on the Chevy Tahoe's location. At approximately 2 p.m., the Chevy Tahoe passed in front of Lemery's patrol car traveling southbound in the center lane of I-75.

4. As the Chevy Tahoe passed in front of Lemery's patrol car, he clocked the vehicle's speed using his radar gun. The Chevy Tahoe was traveling about seventy miles per hour, the legal speed limit. However, Lemery observed that the Chevy Tahoe was following a vehicle too closely. The Chevy Tahoe was about two or three car lengths behind the vehicle in front of it.

5. Lemery pulled onto I-75 and caught up to the Chevy Tahoe. Lemery confirmed that the license plate number was the same number that was supplied to him with the BOLO.

6. Lemery activated the video recorder on his patrol car and followed the Chevy Tahoe for about one mile. (Govt's Ex. 1) Lemery observed that the Chevy Tahoe was still following another vehicle too closely, and Lemery could not determine whether the driver was wearing a seat belt.[3] The Chevy Tahoe was traveling about seventy miles per hour. The video shows that the Chevy Tahoe was about fifty feet behind the vehicle in front of it.[4] (Id.) Traffic on the interstate was light, and there were no obstructing conditions that prevented the Chevy Tahoe from changing lanes.

7. Lemery testified that at seventy miles per hour, a driver should reasonably maintain a distance of about one hundred sixty feet or seven car lengths between his vehicle and the vehicle in front of it.

8. At 2:07 p.m., Lemery turned on his patrol car lights to initiate a traffic stop of the Chevy Tahoe. The Chevy Tahoe stopped near mile marker three hundred thirty-three on I-75 in Sumter County, Florida, which is within the Middle District of Florida.

9. After initiating the traffic stop, Lemery exited his patrol car and approached the passenger side of the Chevy Tahoe. Lemery observed that the occupants appeared nervous. Trejo was the driver of the vehicle, and Ramirez was the passenger.

10. Lemery asked Trejo to shut off the vehicle, place the keys in his pocket, and walk back to

---

[3] The parties dispute whether the front, driver's-side window of the Chevy Tahoe was up or down when Lemery initially saw the Tahoe. This dispute, as discussed subsequently, does not vitiate Lemery's observations as to the distance between the Tahoe and the vehicle ahead of it in the same traffic lane.

[4] Lemery testified that highway skip lines are twelve feet long and spaced thirty-six feet apart. The video shows that the Chevy Tahoe was about one skip line and one space from the nearest vehicle.

3

the patrol car. At about 2:09 p.m., Trejo exited the Chevy Tahoe and walked back to Lemery's patrol car. Trejo leaned against the hood of the patrol car with his back to the camera. Lemery explained to Trejo why he was pulled over. Trejo told Lemery that the Chevy Tahoe did not belong to him, but it belonged to a friend named "Kin." Ramirez remained in the passenger seat of the Chevy Tahoe while Lemery spoke with Trejo.

11. After talking with Trejo for about a minute, Lemery walked back to the Chevy Tahoe to obtain the vehicle registration and proof of insurance from Ramirez. Trejo remained at the front of the patrol car, unrestrained.

12. At 2:10 p.m., Florida Highway Patrol Trooper Michael Jordan ("Jordan") arrived with a drug-detection canine named Barny. Upon arriving at the scene, Jordan spoke with Trejo at the front of Lemery's patrol car while Lemery obtained the registration and proof of insurance from Ramirez. The canine remained in Jordan's patrol car.

13. At 2:12 p.m., Lemery returned to the patrol car and told Trejo that he was going to run his driver's license, and a minute later, Lemery began to write Trejo a traffic warning for following too closely and for illegal window tint.[5]

14. At 2:15 p.m., Jordan retrieved canine Barny and began an exterior sniff of the Chevy Tahoe. The exterior sniff lasted about one minute, and Barny alerted at the front, passenger door seam and at the front, driver's-side door seam. The canine also exhibited a noticeable difference in behavior at the rear of the vehicle, but it did not alert.

15. At 2:16 p.m., Jordan walked back from the Chevy Tahoe and provided Lemery with a

---

[5] Lemery began writing a traffic warning for illegal window tint although he had not yet tested the tint on the Chevy Tahoe. Lemery's general practice is to write a traffic warning for illegal window tint before testing the tint if his visual observation indicates that the windows are too dark.

nonverbal cue that the canine alerted to the presence of narcotics in the Chevy Tahoe.

16. At 2:17 p.m., Lemery performed a pat down search of Trejo. When the pat down search was complete, Lemery placed Trejo in the back of Lemery's patrol car. A minute later, Lemery asked Ramirez to exit the Chevy Tahoe, and Lemery performed a pat down search of Ramirez. When the pat down search was complete, Lemery placed Ramirez in the back of the patrol car with Trejo.

17. At 2:19 p.m., Lemery and Jordan began searching the Chevy Tahoe. During the search, Lemery and Jordan found two packages of methamphetamine in the center console and one package underneath the center console of the front seat.

18. After officers began searching the Chevy Tahoe, Lemery tested the front, driver's-side window tint using a tint meter. (Govt's Ex. 2) It measured seventeen percent, which is eleven percent lower than the legal threshold of twenty-eight percent under Florida law. See Fla. Stat. § 316.2953. The tint meter has an accuracy of plus or minus two percent.

19. Jordan has worked with canine Barny for three years. Barny is trained to detect marijuana, crack cocaine, powder cocaine, heroin, methamphetamine, and MDMA. In October 2009, Jordan and Barny completed an eighty-hour canine equivalent course. (Govt's Ex. 3) As part of the October 2009 course, Jordan and Barny successfully completed narcotic detection proficiency exams under the standards and guidelines set forth by the Florida Highway Patrol under the supervision of the International Forensic Research Institute and the National Forensic Science Technology Center ("IFRI/NFSTC"). (Id.) In September 2010 and September 2011, Jordan and Barny again successfully completed the IFRI/NFSTC narcotic detection proficiency exams. (Id.)

20. Barny is certified annually and trained weekly; he has never failed to obtain certification. As of the date of the hearing, Barny had performed about eight hundred training finds.[6] In the training finds, Barny never alerted to a location that did not contain narcotics. Barny failed to detect narcotics that were present in about three of the training finds.

21. Search-and-find records maintained by Jordan indicate that out of three hundred eleven searches, canine Barny alerted three hundred three times. (Def Trejo's Ex. 1) Out of three hundred three alerts, officers were unable to find narcotics on seventy-one occasions and were able to find only residue on one hundred seven occasions.[7]

## Conclusions of Law

Defendants challenge the lawfulness of the traffic stop and argue that Lemery did not have probable cause to believe that a traffic violation had occurred or a reasonable suspicion of criminal activity. Defendants also challenge the scope and duration of the traffic stop as well as the lawfulness of the ensuing search of Defendants' persons and their vehicle. Consequently, Defendants seek to suppress any evidence gathered as a result of these searches.

**1.     Probable Cause for the Traffic Stop**

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop qualifies as a seizure under the Fourth Amendment and is subject to the constitutional imperative that it be

---

[6] A training find is an exercise where the canine searches vehicles, rooms, or luggage. Some of the locations contain narcotics, and some do not. The locations may also contain distractors, which are other scents that a canine might encounter when searching for narcotics, such as dryer sheets, dog food, and coffee.

[7] The Government stipulated to the summary of the search-and-find records provided by Trejo.

reasonable under the circumstances. Whren v. United States, 517 U.S. 806, 809-10 (1996).

Generally, an officer's decision to stop a vehicle is reasonable when the officer has probable cause to believe that a traffic violation has occurred. Id. at 810. Probable cause is determined by focusing on whether the circumstances, viewed objectively, justify the stop. Id. at 813. The focus is not on the officer's subjective intent, and an officer's ulterior motives do not invalidate police conduct that is otherwise justified by probable cause. United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (per curiam).

Absent a traffic violation, officers may detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," the reasonable suspicion must be more than an inchoate, unparticularized hunch. Id. (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). The officer must have at least some minimum level of objective justification considering the totality of the circumstances. Id.

Defendants contend that the traffic stop was unlawful because Lemery did not have probable cause to believe that a traffic violation had occurred or a reasonable suspicion that Defendants had engaged in, or were about to engage in, criminal activity. Lemery initiated the traffic stop because he determined that the window tint on Defendants' Chevy Tahoe was too dark, and it was following another vehicle too closely. In Florida, it is a noncriminal traffic infraction to follow another vehicle more closely than is reasonable considering the speed of the vehicles, the traffic conditions, and the condition of the highway. Fla. Stat. § 316.0895(1). It is also a noncriminal traffic violation to

7

operate a vehicle on which the windows have been treated with tint that alters their reflectivity and transmittance beyond certain thresholds. Fla. Stat. §§ 316.2953-54.

According to Lemery, when the Chevy Tahoe first passed his patrol car, it was within two or three car lengths of the vehicle in front of it. The video from Lemery's patrol car shows that the Chevy Tahoe was within about fifty feet of another vehicle immediately before Lemery initiated the traffic stop. These distances are well within the reasonable following distances established by Lemery's testimony.

Lemery testified that the average driver reaction time during daylight hours is 1.6 seconds. The Chevy Tahoe was traveling at about seventy miles per hour just prior to the traffic stop. At seventy miles per hour, a vehicle travels one hundred sixty-four feet in 1.6 seconds. Thus, the average driver will travel one hundred sixty-four feet in the time it takes to react to a roadway danger, and the driver should maintain at least that much distance from the nearest car. Lemery also testified that the Florida Driver's Handbook recommends keeping two seconds of following distance from the nearest vehicle. At seventy miles per hour, a vehicle travels about two hundred feet in two seconds, which is even larger than the following distances recommended by Lemery.

As to the window tint, Lemery believed, based on his experience and training, that the window tint was too dark.[8] Lemery testified that he has conducted thousands of window-tint tests using a tint meter. And during the traffic stop in this case, Lemery used a tint meter to test the visible-light transmittance of the front, driver's-side window and found that it measured seventeen

---

[8] Defendants challenge Lemery's credibility as to his observation that the Tahoe's windows were too dark when he first saw the vehicle. Photographs show, according to Defendants, that the driver's-side window was open, not closed. Since the traffic stop was lawful based on Lemery's visual observation that the Tahoe was following another vehicle too closely, it is unnecessary to resolve this credibility dispute.

percent, which is eleven percent below the minimum legal threshold. (Govt's Ex. 2); Fla. Stat. § 316.2953.

Lemery's testimony concerning a reasonable following distance and his reasons for initiating the traffic stop is credible. The preponderance of the evidence establishes that Lemery had probable cause to believe that a traffic violation had occurred. See, e.g., United States v. Wilbur, 458 F. App'x 829, 830 (11th Cir. 2012) (per curiam) (unpublished) (finding that an officer had probable cause to stop a suspect after the officer noticed that the suspect's vehicle had dark, tinted windows); United States v. Purcell, 236 F.3d 1274, 1276 n.5 (11th Cir. 2001) (finding no error in the district court's determination that a deputy legally stopped a vehicle for a violation of Fla. Stat. § 316.0895 when it was about three car lengths behind the vehicle ahead of it).

That the traffic stop might have been partially motivated by a desire to search the Chevy Tahoe does not invalidate the probable cause for the traffic stop. See Holloman, 113 F.3d at 194. The Government made no attempt to establish reasonable suspicion for the investigatory stop based on alleged narcotics activity. However, as Lemery had probable cause to believe that a traffic violation had occurred, it was a lawful traffic stop.

**2.    Duration of the Traffic Stop**

An officer's investigation during a traffic stop should be reasonably related to the circumstances that justified the stop in the first place. United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003). The traffic stop should not last any longer than necessary to effectuate the purpose of the stop. United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir. 2007). An officer is justified in extending the traffic stop for further questioning if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. Id. at 1237. The suspicion

9

of criminal activity must be more than a hunch, and the officer must be able to articulate some minimal, objective justification for the suspicion. Boyce, 351 F.3d at 1107.

Defendants contend that they were detained beyond the permissible scope of the initial stop. Defendants maintain that once the purpose of the initial stop was complete, officers were not permitted to detain Defendants without a reasonable suspicion of criminal activity or probable cause to make an arrest.

Lemery initiated the traffic stop at 2:07 p.m. Lemery checked Trejo's driver's license and began writing a traffic warning at 2:13 p.m. Lemery was still in the process of writing the warning three minutes later when the canine completed the exterior sniff of the Chevy Tahoe. Additionally, Lemery had not yet tested the tint on the Chevy Tahoe. Trejo and Ramirez were unrestrained during this time. After the canine alerted, Lemery promptly conducted a pat down search of Trejo and Ramirez and placed them in the back of the patrol car. Lemery and Jordan started searching the Chevy Tahoe at 2:19 p.m., twelve minutes after Lemery initiated the traffic stop.

The duration of the stop was reasonable, and Lemery had not finished his traffic investigation when the drug-detection canine alerted to the presence of narcotics. As discussed below, the use of the canine to conduct an exterior sniff of the vehicle did not unlawfully exceed the scope of the traffic stop. When the canine alerted, the officers had probable cause to extend the stop to search the vehicle.

**3. Search and Seizure**

The "automobile exception" permits a warrantless search of a vehicle if the vehicle is operational and officers have probable cause to believe that the vehicle contains contraband or evidence of a crime. Maryland v. Dyson, 527 U.S. 465, 467 (1999) (per curiam). Probable cause

to search a vehicle exists when there is a fair probability that contraband or other evidence of a crime will be found. United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006). Further, a well-trained narcotics dog that alerts to the presence of drugs establishes probable cause to search a vehicle. Id. at 1265; see also United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (per curiam). And the use of a narcotics dog during a traffic stop generally does not implicate a legitimate privacy interest when the use does not expose noncontraband items that otherwise would remain hidden from public view. Illinois v. Caballes, 543 U.S. 405, 409 (2005). When the automobile exception applies, officers may conduct a search of the vehicle that is as thorough as could be authorized in a warrant that particularly describes the place to be searched. United States v. Ross, 456 U.S. 798, 823-24 (1982).

Defendants argue that the use of the canine to sniff the exterior of the vehicle exceeded the scope of the initial traffic stop and that the canine alert cannot establish probable cause for the search because the canine is unreliable. Defendants also contend that officers searched the vehicle without the consent of Defendants or the owner of the vehicle, without a reasonable suspicion of criminal activity, and without probable cause to make an arrest. Lastly, Defendants maintain that officers unlawfully searched Defendants' persons.[9]

In Caballes, the Supreme Court addressed facts similar to those in the present case. 543 U.S. at 406-07. An officer stopped the defendant for speeding without any suspicion of drug activity. Id. The officer radioed the police dispatcher to report the stop, and a second officer overheard the

---

[9] Defendants' motion also contends that officers unlawfully searched Trejo's wallet during the traffic stop. However, the search of Trejo's wallet was not addressed at the evidentiary hearing. In any event, a seizure and inspection of the wallet would have been lawful pursuant to a search incident to an arrest, as discussed below.

11

radio call and responded with a drug-detection canine. Id. at 406. The second officer walked the canine around the car, and the canine altered at the trunk. Id. Officers searched the defendant's vehicle and found marijuana. Id. The entire incident lasted less than ten minutes. Id.

The Court began its analysis by noting that a seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. Id. at 407. However, the Court accepted the trial court's conclusion that the duration of the stop was lawful and held that use of the narcotics-detection canine did not change the lawful character of the traffic stop or implicate Fourth Amendment privacy concerns. Id. at 408.

Here, as the duration of the traffic stop was reasonable, the use of the drug-detection canine to sniff the exterior of the Chevy Tahoe did not violate the Fourth Amendment. Furthermore, the canine alert gave officers probable cause to search the Chevy Tahoe.

Canine Barny is trained weekly and certified annually, and he has never failed to obtain certification. In eight hundred training finds, Barny has never alerted to a location that did not contain narcotics, and he failed only three times to detect narcotics that were present. The video of the stop shows the canine placing his two front paws on the passenger-side door of the Chevy Tahoe multiple times. This behavior is consistent with Jordan's testimony that the canine alerted at the passenger door seam and that the canine generally alerts with his paws.

At the hearing, Defendant Ramirez suggested that Barny might have been alerting to the presence of Ramirez in the passenger seat. But Jordan responded that Barny was given a specific

command to look for narcotics; he normally barks, not scratches, when alerting to people.[10]

The search-and-find records show that canine Barny has conducted hundreds of field searches. In three hundred three alerts during a field search, officers did not recover any narcotics twenty-three and a half percent of the time. And about thirty-five and three-tenths percent of the alerts resulted in officers finding narcotics residue. The Government does not dispute these figures. Rather, the Government takes issue with Defendants' contention that Barny's error rate is the sum of these two percentages, or nearly fifty-eight percent. And the Government submits that although these figures are relevant, they are not dispositive of the canine's reliability.

Because canine Barny is trained to alert to the odor of narcotics, Jordan explained that Barny may alert to residual narcotics traces. And in cases where no narcotics were recovered following an alert, officers may have failed to locate narcotics that were actually present. Thus, a true false alert can occur only in a controlled environment, such as training, where officers can be certain about whether or not narcotics are present.

The preponderance of the evidence supports the conclusion that canine Barny is reliable. Considering that Barny is trained to alert to the odor of narcotics, the twenty-three and a half percent figure is likely a better barometer of Barny's reliability in the field. And even if Defendants' asserted error rate is accepted, absolute certainty is not required to search a vehicle as probable cause exists when there is a "fair probability" that contraband will be found. Tamari, 454 F.3d at 1264; see also United States v. Anderson, 367 F. App'x 30, 33 (11th Cir. 2010) (per curiam) (unpublished) (finding that a canine alert provided probable cause to search a vehicle where the asserted error rate

---

[10] Jordan testified that Barny is dual certified, which means that he is trained to search for narcotics as well as people.

was forty-five percent). Moreover, the training of a dog alone may be sufficient proof of reliability. See United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982). Canine Barny is a certified drug-detection canine that has conducted over eight hundred training finds without a false alert. As a result, Barny's alert gave officers probable cause to search the Chevy Tahoe pursuant to the automobile exception.

Immediately after Barny alerted, Lemery conducted a pat down search of Trejo and Ramirez and placed them in the back of his patrol car. To the extent that Defendants also contend the search of their persons was unlawful, this argument is without merit.

Officers conducting a traffic stop may take steps that are reasonably necessary to protect their safety. See Purcell, 236 F.3d at 1277. This includes conducting a protective search of the driver, the passengers, and the vehicle. Id. An officer conducting stop-and-frisk seizure must have a reasonable, articulable suspicion based on objective facts that the suspect has engaged in, or is about to engage in, criminal activity. United States v. Hunter, 291 F.3d 1302, 1305-06 (11th Cir. 2002).

Lemery and Jordan were aware that Defendants were suspected of transporting narcotics. And the canine alert gave officers further reason to suspect that the Chevy Tahoe contained contraband or evidence of a crime. The officers likely had a reasonable, articulable suspicion of criminal activity that would justify a stop-and-frisk seizure. However, this issue need not be decided as any evidence gathered during the search of Defendants' persons "ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). The discovery of methamphetamine in the vehicle justified Defendants' arrest and would have permitted officers to search Defendants' persons incident to that arrest. See United States v. Diaz-Lizaraza, 981 F.2d

1216, 1223 (11th Cir. 1993) (citations omitted); United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985).

**Conclusion**

The traffic stop was lawful as there was probable cause to believe that a traffic violation had occurred, and the duration of the stop was reasonable. Officers had probable cause to search Defendants' vehicle, and the search of their persons was a lawful search incident to an arrest.

Accordingly, and upon consideration, it is **RECOMMENDED** that Defendants' **Motion to Suppress** (Dkt. 28) be denied.

**Date: May 17, 2012**

*[signature]*
ELIZABETH A JENKINS
United States Magistrate Judge

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).